Filed 1/14/15  P. v. Jauregui CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>GEORGE JAUREGUI,<br><br>        Defendant and Appellant. | B249918<br><br>(Los Angeles County<br>Super. Ct. No. BA391415) |
| In re<br><br>        GEORGE JAUREGUI,<br><br>        on Habeas Corpus. | B258635<br><br>(Los Angeles County<br>Super. Ct. No. BA391415) |

APPEAL from a judgment of the Superior Court of Los Angeles County, George Lomeli, Judge.  Affirmed and petition denied.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant, Appellant and Petitioner.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer, James William Bilderback II and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

George Jauregui appeals from a judgment which sentences him to four years in state prison for possession of child pornography and unlawful sexual intercourse with a minor. In this opinion, we address the issues raised in Jauregui's appeal and in his companion petition for writ of habeas corpus: (1) whether the evidence found on two laptop computers was improperly admitted because a continuous chain of custody was not established by the prosecution and (2) whether Jauregui received ineffective assistance of counsel. We affirm the judgment and deny the writ petition.

**FACTS**

Jauregui was an eighth-grade science teacher at a middle school in Los Angeles. He was in a relationship with another teacher at that school, Nina Klein, with whom he bought a house in 2007. He developed a special relationship with Jeanette P. when he was her eighth-grade teacher. He referred to Jeanette as his "stepdaughter" and kept in contact with her after her graduation. While she was in high school, Jeanette regularly returned to the middle school to serve as Jauregui's student teacher aide and to receive tutoring in math from Jauregui.

On August 25, 2007, Jauregui told Jeanette he loved her. They had their first sexual encounter at his house on December 14, 2007, when Jeanette was 16 years old. Thereafter, they had sex approximately three to four times a week at various locations, including at the middle school, his home with Klein, his brother's house and Karen Evanitsky's house.[1] Jeanette also accompanied him to Arizona in August 2008 and to Catalina Island in September 2008. Jauregui bought Jeanette gifts. He told Jeanette his relationship with Nina was not working and that they slept in separate bedrooms, but that they could not separate because the home they bought together was underwater. Jeanette turned 18 in March 2009.

---

[1] Evanitsky also taught at the middle school. Jauregui testified he was involved in a sexual relationship with her as well.

On December 2, 2008, an assistant principal at the middle school, Irene Hyland, noticed Jauregui and Jeanette in his car. Hyland was in the car ahead of theirs and observed Jauregui nuzzle or kiss Jeanette in her rearview mirror. Hyland recognized Jeanette was a former student and believed she was still a minor. As a result, Hyland reported the incident to the authorities. Jeanette was interviewed at school by officer Douglas Campbell. She admitted to a romantic relationship with Jauregui, but denied having sex with him because Jauregui had told Jeanette he would get in trouble if their relationship came to light. Jauregui was removed from his position and told to report to the district office. Jauregui's immediate supervisor, Assistant Principal Mojgan Moazzez, took his keys to the science storage rooms and to the school. She also confiscated the Apple and Gateway laptops given to Jauregui by the district. After she escorted Jauregui off the campus, Moazzez placed the laptops in a cabinet in her office. The cabinet was unlocked, but was blocked by a desk. The laptops remained in the cabinet until they were retrieved in 2010 by district personnel.

Moazzez was advised that a school administrator would come for the laptops on December 9, 2010. Because she planned to be out of the office that day, she asked assistant principal Kate Sohn to retrieve them from the cabinet and give it to the administrator. Sohn gave the laptops to Lourdes Ramirez-Ortiz, who put them in the trunk of her car. The laptops remained in her car overnight and she locked them in a filing cabinet in her office the next day. An investigator from the school district's human resources department retrieved the laptops on December 15, 2010. Because Ramirez-Ortiz planned to be out of the office, she took the laptops out of the locked cabinet and concealed them in a space behind her door. She advised her administrative assistant where they were. The investigator left a receipt for the laptops on Ramirez-Ortiz's desk.

On December 15, 2010, the district's electronic data analyst made a copy of the hard drives of both laptops. He found sexually explicit pictures of Jeanette on both laptops and alerted the police. The laptops were turned over to the Los Angeles Police Department (LAPD) on January 6, 2011, and they were booked with a property number. The LAPD also discovered pictures of Jeanette on the laptops. Some of the pictures were

taken in the science storage rooms at the middle school while others were taken at Jauregui's home. According to the date stamp assigned to the file by the Apple laptop program, the photos of Jeanette were downloaded from a camera onto the computer on July 17, 2007, and November 7, 2008. Photos were downloaded to the Gateway laptop between August 2007 and December 1, 2008.

Jauregui was arrested on December 5, 2011. After his arrest, Klein searched their home and found sexually explicit photos and DVDs of Jauregui and Evanitsky. Klein also found underwear and shoes in a Victoria Secret's bag as well as poems and cards written to Jauregui from Evanitsky and Jeanette. Klein turned those items over to the LAPD along with two other Apple laptop computers owned by Jauregui. The LAPD found the DVD contained a sexually explicit video of Jeanette that was created or burned on to the DVD on February 23, 2009. One of the Apple computers contained sexually explicit photographs of Jeanette, which were taken sometime in 2008, before she turned 18.

Jauregui was charged by information dated April 11, 2012, with one count of possession of child pornography in violation of Penal Code section 311.11, subdivision (a) and three counts of unlawful sexual intercourse with a minor in violation of section 261.5, subdivision (c).

At trial, the prosecution presented evidence of the aforementioned events. Jeanette admitted her relationship with Jauregui and testified Jauregui began taking sexually explicit photos of her sometime after December 14, 2007, and began to videotape them having sex after December 17, 2007, when she was 17 years old. Jauregui admitted he had an "amorous" relationship with Jeanette, but did not have sex with her until she turned 18 in March 2009. In support of his testimony, he pointed out certain items in the pictures and videos which he purchased for Jeanette after she turned 18. Also, he noted he was not wearing a condom in some of the photos, which indicated they were taken after he got a vasectomy in Spring 2009. He further identified furniture arrangements which were purchased after Jeanette turned 18.

The jury found Jauregui guilty of all four counts. He was sentenced to a total of four years in state prison, comprised of the mid term of two years for the first count of possession of child pornography and eight months each for the remaining three counts of unlawful sexual intercourse with a minor. Jauregui was also ordered to pay various fines and fees as well as register as a convicted sex offender. Jauregui timely appealed and subsequently filed a petition for writ of habeas corpus alleging ineffective assistance of counsel. We ordered the petition be considered with this appeal.

## DISCUSSION

Two principal issues are raised by Jauregui. In his appeal, he contends the trial court abused its discretion when it admitted into evidence the pictures and documents obtained from the two district-issued laptops. In the habeas petition, he contends he received ineffective assistance of counsel.[2] We consider both of these issues below.

### I.      Chain of Custody

At trial, defense counsel sought to exclude the evidence obtained from the two district-issued laptops because the prosecutor failed to meet her burden of proving a continuous chain of custody of those laptops. Defense counsel argued Moazzez did not ask Jauregui to sign a document which acknowledged they were his and did not match the serial numbers of the laptops to those on file. Further, the prosecutor could not show beyond a reasonable doubt that no one had tampered with the laptops in the two years they were kept in an unlocked cabinet.

The trial court admitted the evidence, reasoning the pictures found on the computers spoke for themselves, particularly where they depicted Jauregui with Jeanette. The trial court also determined that the possibility that someone had accessed and tampered with the laptops went towards the weight of the evidence, which the defense could argue to the jury, but not to its admissibility. On appeal, Jauregui challenges the trial court's ruling, contending it denied him his constitutional rights to due process and a

---

[2]      Jauregui also raised ineffective assistance of counsel issues in his appeal.

fair trial. We review the trial court's ruling for an abuse of discretion and find none. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1061 (*Wallace*).)

"*People v. Riser* (1956) 47 Cal.2d 566 [(*Riser*)] sets forth the rules for establishing chain of custody: The burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight.' [Citations.]" (*People v. Diaz* (1992) 3 Cal.4th 495, 559; *Wallace, supra,* 44 Cal.4th at p. 1061.)

In *Riser, supra,* 47 Cal.2d at page 566,[3] the defendant complained of the admission of a bottle and a glass bearing his fingerprints. The bottle and glass were found at the scene of the crime and dusted for fingerprints. When the deputy returned to the sheriff's office, he put the items on an open book case in an office he shared with another officer. The items remained there for four hours until they were locked away. The California Supreme Court held it was unnecessary for the prosecutor to negate all possibility of tampering during the four hour period the bottle and glass sat on the book case. (*Id.* at pp. 580-581.) Finding no error, the high court reasoned, "In the present case defendant did not point to any indication of actual tampering, did not show how fingerprints could have been forged, and did not establish that anyone who might have been interested in tampering with the prints knew that the bottles and glasses were in Deputy Sheriff Lochry's book case." (*Id.* at p. 581.)

The California Supreme Court also addressed a chain of custody issue in *Wallace*, *supra*, 44 Cal.4th at page 1061. There, a pair of socks was taken from the defendant at

---

**3** Riser was overruled on other grounds by *People v. Chapman* (1959) 52 Cal.2d 95, 98, and *People v. Morse* (1964) 60 Cal.2d 631, 648-649.

the time of his arrest. He had worn them on his hands and there appeared to be blood on them. (*Id.* at pp. 1060-1061.) At trial, the prosecution attempted to admit the socks into evidence. The socks were brought to court in two individual envelopes, which were placed inside a larger envelope. Defense counsel objected to their admission because "the outer envelope containing the two individually labeled envelopes was dated 1993, whereas the individual envelopes were dated June 19, 1991." (*Ibid.*) In short, there was no recorded chain of custody information from the time between 1991 and 1993. The arresting officer testified he recognized the socks as the same ones he removed from the defendant's hands. He further confirmed he originally put the socks in containers, not envelopes, and placed them in the department's property room. (*Ibid.*) He admitted he failed to follow standard operating procedure when he did not initial or otherwise mark the evidence and he was informed that the evidence had been repackaged several times by the property room staff. (*Ibid.*)

Overruling the defendant's objection, the trial court admitted the socks into evidence. The California Supreme Court concluded, "[a]lthough the record of the chain of custody in this case was far from perfect, we disagree with defendant that these shortcomings rendered the admission of the socks an abuse of the trial court's discretion. [Citation.]" (*Wallace, supra,* at p. 1061.) The high court noted the defendant did "not suggest that the socks were tampered with, he merely assert[ed] it was 'as likely as not' that the socks tested by the prosecution's criminalist were not the same ones confiscated from defendant at the time of his arrest." (*Id.* at p. 1062.)

As in *Wallace* and *Riser*, the record of the chain of custody for the laptops was far from perfect, but any shortcomings do not render the evidence inadmissible or inadequate to support the verdict. " 'While a perfect chain of custody is desirable, gaps will not result in the exclusion of evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 134.) Any inadequacies in the chain of custody merely go to the weight of the evidence. (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 311, fn. 1.)

7

Here, testimony from multiple individuals accounted for the whereabouts of the laptops. Moazzez testified she placed the laptops in a cabinet which was blocked by a desk. When Assistant Principal Sohn retrieved the laptops, she had to move the desk to access the cabinet. She testified she did not know the laptops were in the cabinet until Moazzez asked her to give them to the school administrator. She also observed the laptop cases were dusty, one more so than the other. The laptops were then transferred from Moazzez to Ramirez-Ortiz to Koch-Wain and then to the LAUSD electronic data analyst. Until December 15, 2011, none of the individuals along the chain of custody had even opened the cases containing the laptops.

Because the laptops were placed in an unlocked cabinet, however, Jauregui speculates that "there existed a real possibility that the computers scanned and reviewed . . . were not the computers in their original state prior to December 10, 2010." *Wallace* tells us this type of speculation is not enough to warrant exclusion of the evidence; there was no indication the laptops were tampered with while they were in the cabinet in Moazzez's office or at any other time. As in *Riser*, Jauregui does not point to any indication of actual tampering, did not show how the images on the laptops could have been forged or altered, and did not establish that anyone who might have wanted to tamper with the laptops knew that they were in the cabinet or with any of the individuals who took custody of the laptops. Nevertheless, Jauregui insists it is sufficient to show that the proper procedures were not followed when he returned the laptops to Moazzez. As shown in *Wallace,* the failure to follow standard operating procedures does not irreparably break a chain of custody. The prosecution need not negate all possibility of tampering. (*Riser, supra,* 47 Cal.2d at pp. 580-581.) The jury was capable of determining what weight to give the testimony about the gaps in the chain of custody. (*People v. Richardson* (2008) 43 Cal.4th 959, 1004.)

Moreover, Jauregui presented no evidence that the laptops were not the same ones confiscated from him. Jauregui admitted at trial that the laptops in question looked like the ones issued to him, primarily due to the distinctive stickers and markings on them. Moazzez did not tell anyone the laptops were in the cabinet, including Sohn. Information

8

and documents – aside from the numerous photographs of Jeanette and Jauregui – contained in the laptops indicated they belonged to Jauregui: both laptops contained accounts in Jauregui's name; a letter of recommendation written by Jauregui for Jeanette dated October 29, 2008, was found on the Apple laptop; and the Gateway laptop contained chat logs between Jauregui and Jeanette. Given these facts, the trial court reasonably admitted the evidence obtained from the laptops.

With the California Supreme Court's guidance on this issue, we need not follow the result in *People v. Jimenez* (2008) 165 Cal.App.4th 75, which Jauregui acknowledges is "not precisely on point." In *Jimenez,* "the chain of custody amount[ed] to nothing more than a link here, a link there, with little more than speculation to connect the links into a chain." (*Id.* at p. 81.) Here, the links of the chain are well set out and any deficiencies properly went to the weight of the evidence rather than its admissibility. Having concluded there was no error in admitting the laptops and their contents into evidence, we need not address Jauregui's constitutional claims that his rights to a fair trial and due process were violated.

## II.    Ineffective Assistance of Counsel

Jauregui was represented by Chad Calabria at trial. Jauregui contends Calabria provided ineffective assistance of counsel as a result of his medical issues and a conflict of interest. During trial, Calabria experienced significant pain associated with gout or arthritis. The trial was delayed or ended early a number of times due to Calabria's medical issues. Unbeknownst to Jauregui, Calabria also faced criminal prosecution from the Los Angeles District Attorney's Office for forgery. Calabria was charged on January 29, 2013, three months prior to Jauregui's trial, and was convicted on August 28, 2013. Jauregui blames Calabria's purported failure to subject the prosecutor's case to any meaningful adversarial testing on his medical condition and conflict of interest. In particular, Jauregui complains Calabria: (1) only used one peremptory challenge during voir dire; (2) failed to file any pretrial motions or object to the prosecutor's motions in limine; (3) failed to make an opening statement; (4) failed to cross-examine

9

many witnesses and made a cursory cross-examination of several other witnesses; and (5) stipulated to the testimony of eight different prosecution witnesses.

Jauregui relies on *United States v. Cronic* (1984) 466 U.S. 648 (*Cronic*) to support his argument. In *Cronic*, the Supreme Court offered guidance on when counsel has rendered ineffective assistance. It explained, "the adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.' [Citation.] The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted – even if defense counsel may have made demonstrable errors – the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. As Judge Wyzanski has written: 'While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators.' [Citation.]." (*Id.* at pp. 656-657, fns. omitted.)

The *Cronic* court further cautioned, however, that "the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." (*Cronic, supra,* at p. 657, fn. 19.) With these principles in mind, the high court found defense counsel did not render ineffective assistance despite the fact that counsel was given only 25 days to prepare for trial, he was young and inexperienced in criminal matters, the charges were complex, and grave, and some witnesses were not easily accessible. The court held the defendant failed to show actual ineffectiveness. (*Id.* at p. 657.)

Thus, the high court established a claim of ineffective assistance of counsel involves two components: a showing the counsel's performance was deficient and proof of actual prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 684 (*Strickland*); *People v. Garrison* (1989) 47 Cal.3d 746, 786.) Without reaching the issue of whether Calabria's performance was deficient, we find it most efficient to move directly to the

10

required element of prejudice. In doing so, we conclude Jauregui has failed to demonstrate he suffered actual prejudice required under *Strickland* and *Cronic*.

A. No Prejudice Was Shown

To prevail on a claim of ineffective assistance of counsel, a convicted defendant must demonstrate that his trial counsel's deficient performance resulted in prejudice. That is, the defendant must show a reasonable probability that, but for counsel's failing, the result of the criminal proceeding would have been more favorable to the defendant. (*Strickland, supra,* 466 U.S. at pp. 693-694.) "[B]ecause we presume that the lawyer is competent to provide the guiding hand that the defendant needs, [citation], the burden rests on the accused to demonstrate a constitutional violation." (*Cronic, supra,* 466 U.S. at p. 658.) Accordingly, the defendant must show how specific errors of counsel undermined the reliability of the finding of guilt. (*Id.* at p. 659, fn. 26.)

Jauregui fails to make that requisite showing. For the most part, he fails to disclose how Calabria's errors prejudiced him. As to Calabria's performance at voir dire, Jauregui does not identify any juror who should have been excused. Indeed, Jauregui fails to provide a transcript for voir dire in the record on appeal or with his petition. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295-1296 [appellant bears burden of providing adequate record of error].) Without knowing anything about the potential jurors, Jauregui's argument that the outcome would have been different if Calabria had used more than one peremptory challenge is meritless. (*People v. Williams* (2013) 218 Cal.App.4th 1038, 1074.)

Jauregui similarly fails to demonstrate how he was prejudiced by each of the remaining errors he attributes to Calabria. Although Jauregui contends, "[t]here were several issues important to the presentation of evidence in this case that required such a motion[in limine,]" for example, he does not identify what those issues are. He complains Calabria orally moved the court to exclude the district-issued laptops. Whether Calabria should have filed a written motion, instead, Jauregui does not say. Jauregui also complains that Calabria offered no opposition to the prosecutor's motion to admit expert testimony on the grooming process and to explain why Jeanette initially

11

denied a sexual relationship with him.  Again, Jauregui fails to disclose what type of opposition would have successfully excluded the testimony and how the admission of the testimony prejudiced him.  Likewise, Jauregui faults Calabria for failing to give an opening statement, but fails to explain how that was prejudicial, particularly since there is no indication in the record whether Calabria articulated his theory of the case during voir dire.  Jauregui acknowledges, however, that "[d]uring his closing argument, Calabria established the defense theory of the case."

Next, Jauregui complains Calabria "only minimally" cross examined seven witnesses:  Officer Campbell, Assistant Principal Sohn, Buckner, Belovsky, Officer Kown and Detective Jordan.  Yet, he does not elaborate on which topics of cross-examination Calabria should have also covered with each witness.  Jauregui further asserts that Calabria "utterly failed" to cross-examine Ramirez-Ortiz and Detective Aguirre; he "did not attempt to impeach their testimony, challenge their recollections and perceptions, or test their credibility."  Yet, he does not contend they committed perjury or their recollections and perceptions were unreliable in any way.  "[N]ormally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make."  (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)  Jauregui does not explain how Calabria's decisions regarding the cross-examinations of these witnesses fell outside this wide range of tactical decisions.  The cases cited by Jauregui to support the argument that a failure to cross-examine key witnesses can constitute ineffective assistance are inapposite.  (*Tomlin v. Myers* (9th Cir. 1994) 30 F.3d 1235, 1238-1239 [defense counsel called himself "derelict" for not making a motion which his client had " 'everything to gain and nothing to lose' "]; *Higgins v. Reninco* (6th Cir. 2006) 470 F.3d 624, 633 [failure to cross-examine sole witness implicating defendant as shooter when the witness had gun powder on his hands, had made prior inconsistent statements, had a slip-of-tongue during direct examination, and had a self-interest in the outcome of the case].)

Finally, Jauregui faults Calabria for stipulating to the testimony of eight different witnesses, four of whom would have testified on the chain of custody issue. Again, though, he points to no exculpatory or impeachment evidence that cross-examination would have elicited. " ' "We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation." ' [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Jauregui sums up his argument thus: "In short, counsel completely failed to cross-examine two prosecution witnesses and then minimally cross-examined seven other witnesses. He then stipulated to the testimony of eight witnesses. Thus, he never explored other possible defense theories by undermining their testimony." This argument is meritless. Despite his numerous complaints about the deficiencies in Calabria's representation during trial, Jauregui does not contend Calabria did not adequately investigate the case or did not sufficiently explore all available defenses prior to trial. In fact, Jauregui does not present any alternative defenses to the charges against him. Jauregui's contention that Calabria should have been developing his case *during* trial is preposterous.

The record is clear. Jauregui was convicted because he had sex with Jeanette beginning when she was 16 years old and took explicit pictures and videos of her. There was ample evidence of his crimes, as detailed above. He has made no showing that the result of the trial would have been different had his defense counsel excused additional jurors, made an opening statement, cross-examined additional witnesses, or filed more pre-trial motions. In short, Jauregui has not demonstrated that Calabria's failures, taken together or separately, amount to ineffective assistance of counsel.

B. Prejudice Is Not Established Simply From An Actual Conflict of Interest

In an attempt to avoid the result above, Jauregui relies on a recent decision issued by our colleagues in Division One, *Harris v. Superior Court* (2014) 225 Cal.App.4th 1129 (*Harris*). In *Harris,* Melvin Harris hired attorney Gustavo Diaz to represent him in his criminal proceedings. At the time of Harris's preliminary hearing, Diaz himself had been arrested and was also facing felony charges by the Los Angeles District Attorney.

13

Further, the same officer who arrested Harris and who was the sole prosecution witness at Harris's preliminary hearing, had also previously arrested Diaz and therefore was a potential witness against him. A few months after Harris's preliminary hearing, he learned from the arresting officer that Diaz had also been arrested. By this time, a new attorney had been assigned to Harris when Diaz could not be located. Harris's new attorney immediately filed a motion to dismiss or set aside the information. (*Id.* at p. 1134.) The trial court denied the motion to dismiss the information. (*Id.* at p. 1135.) Harris thereafter petitioned for writ relief, contending he was denied his constitutional rights to effective assistance of counsel. (*Id.* at p. 1137.) Division One granted the petition for writ of prohibition and ordered the information dismissed. In doing so, the court found that Diaz's conflict of interest at Harris's preliminary hearing required dismissal of the information without an affirmative showing of prejudice. (*Id.* at p. 1145.)

Jauregui latches on to this holding to argue that affirmative prejudice need not be shown because, like Diaz, Calabria labored under an actual conflict of interest. As in *Harris,* Jauregui posits, "It can reasonably be assumed that Calabria had an interest in maintaining cordial and cooperative relationship with the district attorney's office. This relationship undoubtedly could benefit Calabria in achieving a favorable disposition of the charges which he faced." Although factually similar, *Harris* does not apply because Jauregui stands in a much different procedural posture than Harris did.

*Harris* relied on *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519 (*Pompa-Ortiz*), which held that "[w]hen the issue is raised in the trial court before the defendant's conviction, a challenge to counsel's conflict of interest does not depend on a showing that conflict-free counsel would have obtained a better result." (*Harris, supra,* at p. 1146.) The Supreme Court has cautioned that the "decision in *People v. Pompa-Ortiz* must not be read overbroadly." (*People v. Standish* (2006) 38 Cal.4th 858, 886.) The reason prejudice need not be shown in *Pompa-Ortiz* and *Harris* is because the defendant could have avoided the error by seeking writ review. If the defendant had done so, the matter could have been "expeditiously returned to the magistrate for proceedings free of the

14

charged defects." (*Pompa-Ortiz*, at p. 529.) If the defendant prevailed by writ, he could still have been tried and convicted. (See Pen. Code, § 999 ["An order to set aside an indictment or information . . . is no bar to a future prosecution for the same offense"].) Here, Jauregui cannot benefit from the holding *Harris* because he has already been convicted.

## DISPOSITION

The judgment is affirmed and petition is denied.




BIGELOW, P.J.

We concur:


RUBIN, J.


GRIMES, J.

15