Filed 9/16/15  P. v. Owens CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHARLES ALONZO OWENS,<br><br>    Defendant and Appellant. | 2d Crim. No. B253680<br>(Super. Ct. No. 1410576)<br>(Super. Ct. No. 1411255)<br>(Santa Barbara County) |

Charles Alonzo Owens appeals his conviction by jury for first degree murder (count 1; Pen. Code, §§ 187, subd. (a), 189)[1], corporal injury to a cohabitant (count 2; § 273.5, subd. (a)), attempted forcible oral copulation (count 3; §§ 664/288a, subd. (c)(2)), sodomy by use of force (count 4; § 286, subd. (c)(2)), forcible rape (count 5; § 261, subd. (a)(2)), and felony dissuading a victim/witness by force or threat (count 6; § 136.1, subd. (c)(1)).  On count 1 for murder, the jury made the special circumstance finding that the victim was killed for a criminal street gang purpose (§ 190.2, subd. (a)(22)).   It further found that appellant personally and intentionally discharged a firearm causing the victim's death (§12022.53, subds. (d)(-(e)),  and that counts 1 and 6 were committed for the benefit of a criminal street gang (§ 186.22,

---

[1] All statutory references are to the Penal Code unless otherwise stated.

subd. (b)(4)).   On counts 2 through 6 appellant admitted two prison prior enhancements (§ 667.5, subd. (b)).

Appellant was sentenced to a determinate term of 23 years state prison on counts 2 through 5.[2] On count 1 (first degree murder with special circumstance gang finding), the trial court sentenced appellant to life without the possible of parole, plus 25 years to life on the firearm use enhancement (§ 12022.53, subd. (b)).  On count 6 (dissuading a victim/witness by force or threat to benefit a gang), appellant was sentenced to seven years to life state prison.  The total aggregate sentence was 23 years state prison (counts 2-5), plus an indeterminate term of 32 years to life (counts 1 and 6), plus life without possibility of parole (count 1).

Appellant contends that the trial court erred in consolidating the murder complaint (Case No. 1410576) and the sexual assault/witness intimidation complaint (Case No. 1411255) for trial.  Appellant further contends that the evidence does not support the conviction on count 6 (dissuading a victim/witness by force or threat) or the gang enhancement.  We reverse the gang enhancement finding because count 6, *as charged and proven*, was not committed for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(4).)  Because the gang enhancement changes the sentence from a determinate sentence to an indeterminate seven-year-to-life sentence (§ 186.22, subd. (b)(4)(C); see *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900, fn. 6), we reverse the sentence on count 6.  We `remand for resentencing.  In all other respects, the judgment is affirmed.

*Facts and Procedural History*

---

[2] The 23 year determinate sentence was based on the following sentence calculation: four  years state prison on count 2 (corporal injury to a cohabitant), plus one year on count 1 (attempted forcible oral copulation; one-third the three year midterm), plus eight years on count 4 (forcible sodomy), plus eight years on count 5 (forcible rape), plus two years of the prison prior enhancements (§ 667.5, subd. (b)).

2

A jury convicted appellant of the 2007 murder of Michael Spradling (an ex-gang member) and the 2011 sexual/physical assault and victim/witness dissuasion of S.M. (appellant's girlfriend) based on the following evidence:

In 2007, appellant was a member of the Six Deuce Brims gang and embroiled in a gang war with the VLP, a rival Hispanic gang that killed Jerald Hughes, a Blood gang member. On June 11, 2007, appellant attended a party hosted by Crips gang member Anthony "L.A." Best. After the VLP gang disrupted the party, appellant and L.A. agreed to go out and hunt an "ese," a derogatory term to describe a Hispanic gang member. Appellant had a .38 caliber revolver and targeted Michael Spradling outside a Lompoc apartment. Although Spradling was not an active VLP gang member, he had a "Lompoc" tattoo on his neck that broadcast his affiliation with VLP.

L.A. lured Spradling into the alley and appellant shot Spradling in the groin, the chest, and the forehead. Sissy Inman, an apartment manager, heard the gun shots and saw two African American men run between the apartment buildings. Appellant was holding a handgun and hid it. Inman believed the men were gang members and provided a physical description that closely matched appellant and "L.A."

Appellant returned to the party and spoke to Kenny Norwood, a Blood gang member, who asked Lawrence Faulkner to retrieve the revolver. Faulkner and Anthony Flippen saw appellant pacing back and forth and sensed that something was wrong. Faulkner believed the gun was "hot" (i.e., recently used to shoot someone) and did not want to be involved. Flippen decided to retrieve the revolver and showed it to Faulkner the next morning. Faulkner knew it was appellant's revolver and panicked when he heard about the Spradling murder. Flippen sold the revolver to a third party but Faulkner paid $200 to buy it back. The police never found the revolver.

A few days after the shooting, the police searched L.A.'s house and found .38 caliber bullets wrapped in a wash cloth. The police arrested L.A. on a parole

3

violation but developed no leads in the murder investigation. During a jail visit, L.A. told his girlfriend that "Take Off" (appellant) shot Spradling.

A few weeks after the shooting, Faulkner heard appellant brag about "kill[ing] that scrap in the alley." "Scrap" was a disrespectful term for a Hispanic gang member. Appellant said that he shot Spradling "in the balls" and the head.

*2011: Murder Investigation Reopened*

The murder was a cold case for four years until Sergeant Agustin Arias reopened the investigation. Sergeant Arias got a warrant to wiretap appellant's text messages and phone calls, and interviewed appellant's friends to stimulate conversation. Based on the wiretap, L.A. was granted use immunity and testified that appellant murdered Spradling. Faulkner was serving a prison sentence on an unrelated matter and testified to avoid being charged as an accessory after the fact. Labarron Reynolds, a Six Deuce Brims gang member, was granted use immunity and testified that he and appellant shared a jail cell in 2007. Appellant told Reynolds that he killed an "ese" in an alley and shot the victim in the groin, a fact that was never disclosed to the public.

*Appellant's Girlfriend, S.M.*

S.M. (age 18) met appellant in May 2011 but did not know about the murder. After Sergeant Arias reopened the investigation, S.M. noticed that appellant received a lot of phone calls, was acting paranoid, and meeting in private with certain gang members.

On September 13, 2011, Sergeant Arias stopped by S.M.'s house to talk to Adina Smith. Appellant was in the house, punched S.M., and told her not to say anything to the police. Sergeant Arias heard crying and screaming and a loud thump. S.M. came outside and said that she had been arguing on the phone. ~

On October 28, 2011, appellant called April Cummings and complained that the police were still asking questions about the murder. Appellant said the "Niggas got got," gang slang that the victim got "smoked" or killed.

4

On October 31, 2011, the police intercepted a text message in which appellant threatened to "beat [S.M.'s] ass" because she owed him $8. Appellant texted "I'm a Brim. I'll beat yo momma's ass to get you, bitch." Sergeant Arias stopped by the house to check on S.M.'s welfare but appellant intercepted S.M. at the door and told her not to talk to the police. S.M. complied. In December 2011, a few weeks after appellant was charged with murder, S.M. broke off the relationship and moved out of state.

In April 2012, S.M. agreed to talk to the police and reported that appellant had spit on her, beat and raped her, and strangled her. In 2011, appellant accused S.M. of disrespecting his uncle, grabbed her by the throat, and held her up against the wall. S.M. was on "her tippy-toes" and almost blacked out.

On another occasion, appellant saw S.M. dancing with a man. Appellant grabbed S.M. by the hair and shoved her head into a brick wall, knocking her unconscious. A friend, Cozey Blow, told appellant to leave and urged S.M. to report the matter to the police.

S.M. also testified that she was sexually assaulted on multiple occasions. While at her grandmother's house, appellant forced S.M. to orally copulate him. Appellant held S.M. down with his knees, forced his penis into her mouth, and slapped her as she sobbed hysterically. After appellant was done, he pushed her off the bed and told her to "sleep on the floor like a dog."

On another occasion, S.M. was sodomized. Appellant held her against the wall and forced his penis into her anus. Appellant laughed as S.M. cried and limped off to the bathroom bleeding from the anus.

Appellant raped S.M. another time at her house. S.M. tried to fight back, but appellant punched her in the leg five or six times and hit her on the head.

On another occasion, appellant threatened to pay female gang members to "beat the dog shit out of you." Appellant told S.M. that he was "not afraid to pull the trigger," and "[y]ou don't know what I've done in the past." In an October 31, 2011 phone call, appellant warned "if I choked you and did all that to you at the party,

5

what the fuck do you think I won't do to you?"  Appellant bragged about putting a gun in his "baby mama's mouth," a reference to an ex-girlfriend who was pregnant with his child.

Pursuant to Evidence Code section 1009, evidence was received that appellant dated Felisa Talamantez and fathered her child in 2009. Talamantez testified that he spit on her, hit her in the face, and verbally abused her.  When Talamantez was pregnant, appellant whipped her with a rubber snake.

*Gang Expert Testimony*

Santa Maria Police Officer Scott Casey, a gang expert,  testified that appellant was an active member of the Six Deuce Brims, an African-American criminal street gang.  Appellant's moniker was "Take Off,"  but after the Spradling murder, appellant was known as "Teflon" or "SK Takeoff."  "SK" was slang for Scrap Killer.

Officer Casey testified that murder, attempted murder, assault with a deadly weapon, cocaine sales, possession of firearms, and witness intimidation are the primary activities of the Six Deuce Brims.  Maintaining a good reputation in the gang "means everything" and gang members do it by "putting in work" and retaliating against the VLP gang.  Officer Casey stated that gang members dissuade witnesses from testifying to instill fear in the community, enhance the gang's reputation for violence, so that gang members can commit crimes with impunity.

*Order Consolidating Cases*

Appellant claims that the trial court abused its discretion in consolidating the murder case (Case No. 1410576) with the sexual abuse/witness dissuasion case (Case No. 1411255).  Section 954 provides that different crimes, separated by time, may be consolidated for trial where they are of the same class of crimes.  (*People v. Soper* (2009) 45 Cal.4th 759, 771.)

The trial court consolidated the actions because the crimes were assaultive in nature and S.M.'s testimony and the gang expert testimony were cross-admissible.  "[W]hen I first saw this I had some concerns because there was a time gap

6

between the two cases. I was concerned about the testimony part of it, testifying as to one, but not the other. But the deeper I got into it and the more I read the cases, quite frankly, I think there's no question these cases have to be consolidated. . . . I'm convinced that if I didn't grant the consolidation we'd basically hear the same evidence from [J.M.] and the gang expert on both cases anyway."

On appeal, appellant must show that the consolidation resulted in a grossly unfair trial. (*People v. Soper, supra,* 45 Cal.4th at p. 784.) " ' "The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial." [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 666.)

Here, none of the charges carry the death penalty nor is it a capital case. Although the offenses are separated in time, all the offenses -- murder, rape, sodomy corporal injury, forcible oral copulation, and dissuading a witness by force or fear -- are assaultive in nature. (See e.g., *People v. Alvarez* (1996) 14 Cal.4th 166, 188 [rape of the same class of offenses as robbery and murder and properly joined for trial].) Section 954 permits the joinder of two or more different offenses of the same class of crimes. (*People v. Thomas* (2012) 53 Cal.4th 771, 798.) The same gang allegation (§ 186.22, subd. (b)(4)) is also present in both cases and supports the consolidation. (See *People v. Becerra* (2008) 165 Cal.App.4th 1064, 1068.) Appellant told S.M. that he was a Brim and not afraid to pull the trigger. The gang remark connected him to the

7

Spradling murder and was cross admissible to show motive, intent, and to assess S.M.'s credibility. (CALCRIM 1403.)

Appellant argues that the consolidation denied him a fair trial because the charges were highly inflammatory and each case was weak. Appellant's guilt on the murder count was established by overwhelming evidence. L.A., an eye witness to the shooting, saw appellant shoot Spradling in the groin, chest, and head. A few weeks after the shooting, appellant bragged about shooting the victim in "the balls first. . . ." In 2007, while in jail on an unrelated matter, appellant told fellow gang member Labarron Reynolds about the shooting.

Appellant complains that the domestic violence and sexual assault counts were inflammatory but they were no more inflammatory than the murder. J.M.'s testimony was corroborated by friends who saw appellant assault S.M. When Sergeant Arias stopped by to interview S.M.'s friend on September 13, 2011, appellant punched S.M. Even more damning are the recorded phone calls and text messages about the physical and sexual assaults.

Appellant argues that both cases are highly inflammatory but that does not compel a trial severance. Our courts "have required extreme disparity between weak and strong cases, or between inflammatory and noninflammatory offenses, in order to demonstrate the potential for prejudicial 'spillover' from one case to the other . . . . [Citations.] These cases also have given increasing recognition to the benefits to the state of joinder, noting the conservation of judicial resources and public funds and the benefit to the public of reduced delay in the disposition of criminal charges. [Citations.]" (*Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1284.)

When the motion to consolidate was argued, appellant failed to show that the evidence on any one charge was significantly stronger than the other charges, thus "creating the danger that [the stronger case] would be used to bolster the weaker case. . . ." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1318.) The crimes involved different victims, different time periods, and were of such a distinct nature that the risk of jury confusion was minimal. (*People v. Mendoza* (2000) 24 Cal.4th 130, 163.)

8

Appellant makes no showing that the trial court erred in consolidating the cases or that it is reasonably probable that he would have received a more favorable outcome had the cases been tried separately. (*People v. Bean* (1988) 46 Cal.3d 919, 940; *People v. Soper, supra,* 45 Cal.4th at p. 784.)

*Count 6: Dissuading a Witness*

Appellant argues that the evidence does not support his conviction for dissuading a witness by force or threat of force. As in any sufficiency-of-the-evidence case, we review the record in the light most favorable to the prosecution and draw all reasonable inferences in support of the judgment. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We do not reweigh the evidence or reassess the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

Appellant claims there was no witness dissuasion because S.M. loved him and lied to the police on her own volition. But the prosecution did not have to prove that appellant was successful in dissuading S.M. Section 136.1 "targets prearrest efforts to prevent a crime from being reported to the authorities. [Citation.]" (*People v. Navarro* (2013) 212 Cal.App.4th 1336 1347.) The crime is completed once the defendant takes an immediate step toward knowingly and maliciously attempting to persuade a witness or victim not to report a crime. (See e.g., *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1519.)

It is uncontroverted that appellant punched S.M. and told her not to say anything on September 13, 2011, when Sergeant Arias stopped by the house. On October 31, 2011, the police intercepted text messages that appellant had raped, choked, strangled, and beat S.M. Appellant claimed that S.M. owed him $8 and, in a text message, said "I'm not playing. . . . I'm really going to hurt you."

Concerned about S.M.'s safety, Sergeant Arias stopped by the house to speak to S.M. Appellant intercepted S.M. at the door and told her, "Don't talk to them about anything. You don't know anything." Based on appellant's threats and assaultive behavior, the jury reasonably inferred that S.M. feared appellant and did not want to be hit again. (See *People v. Kirvin, supra,* 231 Cal.App.4th at pp. 1519-1520

9

[crime of dissuading a witness can occur through a continuous course of conduct over time].) " 'As long as his words or actions support the inference that he . . . attempted by threat of force to induce a person to withhold testimony [citation], a defendant is properly' convicted of a violation of section 136.1, subdivision (c)(1). [Citation.]" (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344.)

*Count 6 Gang Enhancement*

Appellant asserts that the evidence does not support the finding that he dissuaded S.M. for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(4)). The argument has merit only because count 6 charges appellant with attempting "to dissuade JANE DOE, *a victim of and witness to a crime*, from making a report of such victimization to a police officer. . . .*" (Italics added.) The prosecution could have charged appellant with attempting to dissuade "another person who has been the victim of a crime *or who is a witness to a crime*," (§ 136.1, subd. (b)) but that would be with respect to the murder (Case No. 1410576). J.M. was not a witness to the Spradling shooting and met appellant four years later when she turned 18.[3] Although appellant worried about Sergeant Arias asking questions, S.M. did not know why. She thought it had to do with appellant's parole.

Officer Casey, the gang expert, was asked a hypothetical in which "the shooter" tells his girlfriend "that she doesn't know anything and she should not talk to the detective or say anything. The girlfriend goes outside, but is uncooperative. . . . The shooter is later arrested. Detectives try to talk to the girlfriend, but she refuses to

---

[3] One could argue that appellant ordered S.M. not to talk to the police because she might say something that would implicate him in the murder. Sergeant Arias testified that, J.M. came to the door on October 31, 2011 and "I started asking questions. . . . And as it started getting into questions if he had ever talked to her about the homicide, [appellant] came to the door and told her not to talk to me . . . ." Appellant followed Sergeant Arias out and "as I was leaving he told me, 'Would you tell your wife if you shot somebody?' And I didn't answer him back. I just got in my car and left."

incriminate the shooter in anyway. The shooter is charged with murder . . . [and] [t]he girlfriend refuses to talk to the police for approximately six months."

Officer Casey agreed that the witness intimidation would benefit the gang. The prosecution then asked: "Is that the case even if the girlfriend was going to disclose domestic violence and rape?" Officer Casey responded, "I wouldn't say that part would benefit the gang" and testified that sex offenses are frowned upon by gangs. "[T]hey don't want themselves to be affiliated in any way, shape or form with any kind of sex offense because [of] it's repercussions to them."

The Attorney General cites *People v. Albillar, supra,* 51 Cal.4th 47, 63, for the principle that expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness raises the inference that the conduct was committed for the benefit of a criminal street gang. Here, the victim/witness dissuasion was based on appellant's domestic violence and sexual assault of S.M. Count 6 charged appellant with dissuading "*a victim of and witness to a crime*, from making a report of such victimization to a police officer . . . ." (Italics added.) The jury received a CALCRIM 2623 instruction that the prosecution had to prove that appellant used force or threatened to use force or violence, either directly or indirectly, "*on the person or property of a victim.*" (Italics added.)

"Not every crime committed by gang members is related to a gang" but there are exceptions. (*Albillar*, *supra,* 51 Cal.4th at p. 60.) In *Albillar*, three gang members were convicted of forcible rape while acting in concert. Responding to a hypothetical about the rape, the gang expert "opined that such a crime would have been committed for the benefit of, at the direction of, or in association with a criminal street gang. His opinion was based on the way in which the gang members worked cooperatively to accomplish the rapes, the brutality and viciousness of the crimes, and the enhancement to the reputations for violence and viciousness of the gang and the participating gang members." (*Id.*, at p. 53-54.) The court held that "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang. the jury may fairly infer that the defendant had the

11

specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.*, at p. 68.)

Unlike *Albillar,* appellant did not act in concert with gang members to assault S.M. or dissuade her from reporting the domestic violence and sexual assaults. Rape was shunned by the Deuce Six Brims gang and did not enhance the reputation of the gang or appellant. In the words of Officer Casey, rape of a girlfriend is a "no-no" and gang members "don't want themselves to be affiliated in any way, shape or form with any kind of sex offenses because [of] it's repercussions to them. It means that they're going to be automatically dropped out of the gang because of their crime. . . ." That is the gang culture. Gang members strive for respect and try to maintain a good reputation in the gang, which "pretty much means everything." Officer Casey explained that a gang member who commits rape or sexual assault can be "put out from the gang" and targeted for assault by fellow gang members.

The evidence shows that appellant dissuaded S.M. from talking to the police for personal reasons, i.e., to prevent her from reporting the domestic violence and sexual assaults. Although a lone actor can be charged with a gang enhancement (see *People v. Rios* (2013) 222 Cal.App.4th 542, 564), there is no substantial evidence that appellant dissuaded S.M. " 'for the benefit of, at the direction of, or in association with any criminal street gang' (the gang-related prong), 'with the specific intent to promote, further, or assist in any criminal conduct by gang members' (the specific intent prong)." (*Ibid*., citing § 186.22, subd. (b)(1) and *Albillar, supra,* 51 Cal.4th at pp. 59-60].) It is a two prong requirement which provides "a nexus sufficient to alleviate due process concerns. [Citation.]" (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1139.) That "nexus" is lacking here because count 6, as charged and proven, is based on victim dissuasion for personal reasons. Appellant physically and sexually abused S.M. and tried to dissuade her from reporting it to the police. That is what makes S.M. both a victim and a witness as charged in count 6. The victim dissuasion was not a gang related felony or committed with the specific intent to promote or assist the criminal conduct of Six Deuce Brims gang members. We accordingly reverse the

12

gang enhancement finding which carries a seven-to-life sentence and remand for resentencing on count 6. (*Robert L. v. Superior Court, supra,* 30 Cal.4th at p. 900, fn. 6 [section 186.22(b)(4) is an alternate penalty provision that changes a determinate "triad" sentence to an indeterminate life sentence].)

*Conclusion*

Appellant makes no showing that the trial court abused its discretion in consolidating the cases for trial or that he was denied a fair trial. (*People v. Soper, supra,* 45 Cal.4th at p. 784.) Appellant's guilt on count 6 was clearly established but the prosecution failed to prove that appellant's attempt to silence S.M. was for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(4)). We reverse the gang enhancement finding on count 6 and remand the cause for resentencing. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:



GILBERT, P. J.



PERREN, J.

13

Rick Brown, Judge

Superior Court County of Santa Barbara

_____

Robert Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Jessica C. Owen, David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.